[Cite as *State v. Manley*, 2015-Ohio-4199.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 26195 |
| | : | |
| v. | : | T.C. NO. 14CRB105 |
| | : | |
| SHEILA MANLEY | : | (Criminal appeal from |
| | : | Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . .

**O P I N I O N**

Rendered on the ____9th____ day of ____October____, 2015.

. . . . . . . . . .

JOHN D. EVERETT, Atty, Reg. No. 0069911, Prosecuting Attorney, City of Kettering, 2325 Wilmington Pike, Kettering, Ohio 45420
        Attorney for Plaintiff-Appellee

MARIA L. RABOLD, Atty. Reg. No. 0089080, 443 E. Central Avenue, Miamisburg, Ohio 45342
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1} This matter is before the Court on the Notice of Appeal of Sheila Manley, filed April 23, 2014. Manley appeals from her March 26, 2014 conviction, following a jury trial, on one count of domestic violence, in violation of R.C. 2919.25(A), a misdemeanor of the first degree. The victim is Manley's husband, David Manley. Sheila was sentenced

on April 18, 2014 to 180 days in the Montgomery County Jail, 175 days were suspended, and she received two days of jail time credit. She was placed on supervised probation for a period of three years and ordered to complete treatment through Kettering Behavioral Medicine. Her sentence was stayed pending this appeal. We hereby affirm the judgment of the trial court.

{¶ 2} Sheila was charged with the above offense by way of criminal complaint in Kettering Municipal Court on January 21, 2014. She pled not guilty on the same date. At her March 26, 2014 trial, David Manley testified that he and Shelia were married for over 23 years. He stated that on January 18, 2014, he, Sheila, and their son and daughter resided together at their home in Kettering. David stated that on that date, he was in basement of their home with their daughter watching television, and that after he fell asleep, he "was awakened by Sheila screaming, coming down the stairs." David stated that Sheila "wanted to have a conversation immediately about money and lawyers." When asked if he recalled the time that this occurred, David responded, "Not exactly. It was late in the afternoon, 5:30 possibly. I don't recall exactly." He testified that he and Sheila "had an argument about how much money was in the checking account and money that my wife wanted to spend hiring lawyers to file legal actions against other members of her family and we argued back and forth for a little bit. She got very angry and she punched me in the face while I was sitting on the couch." David stated that "after the first punch, which caught me by surprise, I just kind of put my hands up and she disappeared upstairs. I didn't know what to do at that point. I was scared, the guns are upstairs, and she was obviously angry and violent, so we have a telephone in the basement – I picked up the phone and I called the police." David stated that their daughter went upstairs

when Shelia began screaming at him. David testified that as a result of the punch, his glasses "were partially smashed and I had blood coming down the side of my face."

{¶ 3} David stated that the police arrived within 10 minutes. Sheila was in the master bedroom upstairs, and that he "very quietly walked up the stairs and peeked out the dining room window." Upon observing the lights of the police outside, David stated that he "went immediately to the front door and opened the front door and stood on the porch to greet the police officers." David testified that he explained to the officers what had occurred and invited them inside the house. He stated that he did not seek medical treatment for his injury. David identified two photographs taken of him after the officers arrived that depict broken skin and some redness on the left side of his nose above the nostril (State's Exhibits 9 and 10). According to David, a bruise later developed "a bit" in the area, and he "used cold compresses" that evening. After reviewing the written statement that he provided the officers, David testified that at the time he advised them that he wanted Sheila to leave for the remainder of the evening because "she was very violent and hostile and I figured if we had a little bit of time apart, everything would cool down and we could have a reasonable discussion the next day and everything would be okay."

{¶ 4} On cross-examination, when asked if he filed a motion in Domestic Relations Court seeking exclusive possession of the marital residence after the incident, David responded, "I signed something at my attorney's office last Thursday." He stated that he intended to obtain an order compelling Sheila to vacate their home. David stated that in June, 2012, he signed a "separation agreement," drafted by Sheila, indicating that he granted exclusive use of the marital home to her. He stated that he and Sheila both

signed the document at a bank and had it notarized. David stated that Sheila "explained to me that she wanted me to sign something so that she would feel safe and secure, and that we could continue to live together under better circumstances." According to David, Sheila filed for divorce in January, 2013, and for a period of time he resided with his parents before he and Sheila reconciled.

{¶ 5} David stated that he argued with Sheila for "[p]erhaps half an hour" before she struck him. He acknowledged that his written statement indicates that the incident occurred at 9:45 p.m., and he stated that it "was difficult to know what time it was; it's dark in the basement, there are no natural sources of light down there." David stated that he had two or three beers before falling asleep. He stated that he did not sign a criminal complaint after the incident, and that he did not want to press charges against Sheila. He indicated that his written statement provides in part, " 'I wanted her to leave for the night. She refused so they took her away.' "

{¶ 6} On redirect, David stated that Sheila is a paralegal, and although he signed the "separation agreement" she drafted, he did not understand all of its terms. After he and Sheila reconciled, David testified that "we had dismissed everything. There were no agreements about anything. We were just living as a normal married couple." David stated that prior to the argument, he did not want Sheila out of the house, and that he has "been in love with my wife ever since I met her."

{¶ 7} Thomas Engles testified that he is an officer with the City of Kettering Police Department, and that he was dispatched to the Manleys' home on January 18, 2014. He stated that upon his arrival "with Officer Savino, as we were walking up to the house, a gentleman was already waiting outside and was kind of walking down from the front door,

down his sidewalk, towards his driveway where we were walking up, and he said – he explained or told us he was tired of being hit." When asked if he noticed anything in particular about David, Engles replied, "No, I really didn't. It was kind of dark and he was calm." Engles stated that the officers entered the home and that he made contact with Sheila in the master bedroom. Engles stated that Sheila "explained that there was an argument that happened down in the basement over an attorney's phone number and how someone had obtained an attorney's phone number, and that during that argument, she brought down this piece of paper that had the attorney's phone number on it." In response to seeing the paper, David "had made a symbol or motion with his hand like he was masturbating type of motion, is the way she explained it, and told her to leave. She explained that she then left the basement where he was sleeping or living down there, she walked up, went into the room and locked herself in the room," according to Engles.

{¶ 8} Engles testified that he then returned to Officer Savino, who was speaking to David in the living room. Engles testified as follows:

> After getting information from Savino, I then went back into the bedroom and asked a couple more questions, and explained that some of the information that I had had was that Mr. Manley had a small cut on his nose. I asked her, Mrs. Manley, is there any way that you were just pushing him or anything that accidently got him to get a cut on the nose and she explained "no" that she never even touched him at all, and that maybe he was just drunk and fell over [and] hit his head on a chair, was her comment.
>
> * * *

Then went out and spoke with Officer Savino again. We tried to figure out what was the best course of action, and it was determined that we would be arresting Mrs. Manley for the domestic violence.

{¶ 9} Engles stated that Sheila was transported to the Kettering jail, that he advised her of her rights, and that she declined to speak to him without an attorney. According to Engles' testimony, he completed a report and signed the criminal complaint against Sheila because David "did not want to sign the affidavit of the criminal complaint of domestic violence," and because Savino had not yet arrived at the jail, and Sheila "was ready to bond out of jail."

{¶ 10} On cross-examination, Engles testified that he was dispatched to the Manley home at 10:29 p.m. He testified that he observed Sheila's hands at the Kettering jail, and that he did not see any red areas on her hands. He stated that when he spoke to Sheila initially in her bedroom, he did so for 15-20 minutes, from a distance of five feet, and that he did not notice any odor of alcohol about her person. Engles stated that Sheila indicated to him that she and David argued between 9:00 and 10:00 p.m. Engles stated that he checked a box on his report indicating that David was injured, and that he typed " 'None, minor injury,' " next to the box. Engles testified that while he was investigating the incident, Sheila "was trying to give us some paperwork that indicated she has sole ownership of the house and he has none, but we did not accept that, that is not part of why we were there." According to Engles, the officers "were there to investigate what [David] was reporting was an assault by his wife; that's why we were there. Not relative to domestic disputes related in other courts." When asked if he sought to obtain any bloody cold compresses from David in the course of his investigation, Engles replied, "No,

this was the first time that I've heard of any cold compress."

{¶ 11} On redirect examination, Engles testified as follows:

There are times when people are struck – I could strike an individual and not have any marks on my hands, so it doesn't give me a direction at times. It gives me an opportunity to look but just because there are no marks, doesn't mean that that person didn't strike them. Same if there is a mark on someone's hands, maybe it is from a previous injury and doesn't mean that that mark came from hitting the person. You usually have to inquire.

{¶ 12} Officer Adam Savino testified that he was dispatched to the Manley residence while on road patrol. He testified that upon arrival, David advised him that Sheila had hit him. He testified that he "noticed that he had a little cut that was slightly bleeding right on the upper basically left part of his nose area. I asked him, 'Is that the injury from where she hit you?' and he said, 'Yes.' " The following exchange occurred:

Q. Then what happened?

A. Basically, he sat down on a chair in that little room and I basically asked him to describe what happened. At that time, he basically told me [the] story of what occurred. He said that he and his wife were in an argument. Initially he was down in the basement sleeping. He was down there with his daughter. He woke up to Mrs. Manley shaking him and he told me that she was upset due to joint checking accounts and some inconsistencies. He told her that he would take care of it. He grabbed his laptop of his (sic) and, according to him, he checked the inconsistencies

and found out what they were. He then emailed her. She was in her room on her computer. I asked him if that was common for them, he said it was, that they would email each other back and forth from the basement to the bedroom. He emailed her that response to whatever it was then he went back to bed. A short time later, he wasn't sure how long it had been since he had been sleeping again, she shook him again, and when he woke up, his daughter was no longer in the basement area, and she was over him and she was yelling at him and she told him that she wanted him out of the house. He basically said, "I'm not leaving, this is my house too." He actually even told her that the weather outside is terrible, there was snow on the ground – there was actually a few inches of snow and it was currently snowing at the time – he says, "I'm not leaving." Then he said she stood over him while he was still sitting on the couch area, and she punched him, and she punched him right in that area where he had the cut on the nose. I asked him which hand or arm she punched him with. He said he thought it was her right hand or arm she punched him with. He said he thought it was her right hand with a closed fist but he wasn't sure. I asked him if she only hit him once and he said, "Well, she swung again but I put my arms up and blocked the punch the second time." He said she then went upstairs and then he waited a short time and called us and we arrived a short time later.

Q. How would you describe the injury on Mr. Manley?

A. It was a small cut. His glasses were a little bit bent. It was slightly

bleeding.

Q. Then what happened?

A. I asked Mr. Manley, I said, "I guess, what do you want to happen tonight?" And he said, "I don't want to press any charges." And I said, "You know, what you are reporting to me is a serious offense, it's domestic violence in Ohio, and we take it pretty seriously. Do you want to pursue charges on this?" And he said, "No." I said, "Okay, what do you want to happen?" He said, "I just actually want her to leave for the night. I don't feel comfortable with her here especially with guns being in the house and I'm afraid she is going to hurt me if I go back to bed." * * *.

* * *

Q. And he has given you a version of events, correct?

A. Correct.

Q. And you are now making sure that that version is – that he repeats that same version?

A. Yes. I'm making sure it is consistent. I'm making sure that he is very serious about what he is reporting to me, and he knows what the consequences of that are.

Q. Then what happens?

A. So, he says he doesn't want to pursue charges. I asked him if he would sign a sworn statement basically to the events that he just described to me and he said that he would. * * *

{¶ 13} Savino stated that after talking to Engles, who related Sheila's version of

events to him, namely that " '[n]othing happened, I don't know what he's talking about, maybe he fell,' " Savino "basically made the decision that, at that time, I had probable cause to make an arrest for domestic violence. Patrolman Engles took her into custody." After Shelia was transported from the home, Savino stated that he "checked the basement. I checked just to make sure * * * at that time what [David] was telling me was accurate." He stated that in the basement "there were some blankets on the couch area. I picked those up and kind of looked around," but that he did not find any evidence of a scuffle.

{¶ 14} Savino stated that he then "went through * * * a domestic violence packet" with David and had him complete his written statement. Savino stated that he advised David that "when we process a domestic violence, you have the opportunity to submit to the court [an] application for a protection order. And I explained to him what that meant. That meant she couldn't come back to the house until basically there was a hearing and she could appeal it but she would be served with that. He did not want the protection order." The following exchange occurred:

Q. Did you discuss anything else with him at that point?

* * *

A. I sat down with Mr. Manley and we had discussion about his relationship and I told him before, I said, "In Ohio, I'm required by law and by the policies in the City of Kettering, when there is a visible injury and somebody is making claims that an assault occurred, and that assault is by a family or household member, I am required to make an arrest. I know that is not what you wanted done, but that is the way I have to do it. Unfortunately, I

think that your relationship is probably over." He was visibly upset by that.

Q. More upset than he was before?

A. Yes.

Q. How could you tell that?

A. He began to cry. I could tell he was very anxious about it. He was kind of rubbing his hands and arms and squirming.

{¶ 15} Savino stated that he spoke to David's daughter and son, and that both of them told him that they had not seen or heard anything. When asked if David appeared to be intoxicated, Savino responded, "I did notice that he had been drinking, and I asked him, and he said that he had had a few, a couple or a few * * *. He did not appear intoxicated to me."

{¶ 16} On cross-examination, Savino acknowledged that David indicated in his written statement that the incident occurred at 9:45 p.m., and that he was dispatched to the residence at 10:29 p.m. The following exchange occurred:

Q. Did you ask him what he did in the 45 minutes between allegedly being hit and calling the police?

A. No.

Q. Your report states that Mr. Manley told you that he waited a few minutes and then called the Kettering Police Department, does it not?

A. That's what he told me.

Q. Did you confront Mr. Manley with the discrepancy between what he told you and what he wrote?

A. To the extent that these times don't necessarily match, but once

again, he was not completely sure, he could only give me approximate times, he was basically woken up, according to him.

Q. Well, is there a difference between "I waited a few minutes and called the police" and forty-five minutes in your mind?

A. There is a difference between a few minutes and 45 minutes if you know what time it is.

* * *

Q. * * * Mr. Manley told you that he blocked another attempted punch with his arms, correct?

A. Yes, sir.

Q. What does your report state about you looking at his arms to determine whether there were any marks consistent with him blocking one or more additional punches?

A. There were no marks on his arms.

Q. Inconsistent with what he said – that he blocked punches with his arms and waited just a few minutes to call the police and you were there several minutes thereafter?

A. Not inconsistent.

Q. Well, let's talk about the time line if we could then. He said that he waited a few minutes and called the police.

A. Correct.

Q. And what's the average response time at that time of night? You were dispatched at 2229 and you arrived approximately 4 minutes later.

A. Three minutes – I was in within three minutes.

Q. Three minutes later – so we've got – waited a few minutes to call dispatch and three minutes later you are there?

A. Correct.

* * *

Q. And in the ten minutes between those two, you saw no marks whatsoever on his arms indicating that he blocked additional punches from his wife?

A. One additional punch and there was no mark.

Q. There were photographs taken of his arms that night, correct?

A. Yes, sir.

Q. And those pictures are consistent with you not seeing anything. The pictures don't show anything?

A. Correct.

{¶ 17} Savino stated that he looked for blood in the basement and did not find any. He stated that he did not observe any cold compresses, and that when officers arrived, David was "messing with his eye" and told to stop so that it could be photographed.  Savino stated that he read the "separation agreement," that David told him that he had never moved out of the residence in the past, and that David's trial testimony that he resided with his parents temporarily was inconsistent with his statement on the night of the incident.  When asked, "Can we agree that there are some substantial inconsistencies between what he told you and what he wrote down," Savino responded, "I can agree that there are inconsistencies."

**{¶ 18}** The Manley's son testified that he was living with his parents and his sister on the date of the incident.   He testified as follows:

Well, my girlfriend and I were in the kitchen.   I was making her some food.   My dad was downstairs.   My mom ended up going downstairs and started * * *   yelling at my dad, so I went upstairs * * * to not hear any of it, and * * * it kinda got louder and louder so I turned my TV up in my room a little bit and I could basically hear my mom yelling from the basement and it went on for a little while, and then my mom screamed really loud, and then the next thing I know, the cops are at my house, and my mom is being taken out in handcuffs * * *

**{¶ 19}**   The son stated that his room is on the second floor of the home.   He stated that the argument "had to do with money and a credit card * * *."   He stated that Sheila's scream was "[a]lmost like shrieking."   He stated he told the responding officers that he "was asleep because I didn't want to get involved, * * * and then they let me go back upstairs."   On cross-examination, the son acknowledged that he lied to the police when they responded to his home.

**{¶ 20}** At the April 18, 2014 sentencing hearing, the following exchange occurred:

COURT:   * * * Mrs. Manley, anything you care to say?

MANLEY:   Your Honor, it's 25 years of my life and we've been at this divorce for a couple of years and I just believe that, at this point, it's just not good, even though we've tried, you know, it's over.

COURT:   Mrs. Manley, the Court had the opportunity to observe your demeanor for an entire day, throughout the trial and subsequent to the

trial, the things that have transpired, and what concerns me is there seems to be a complete lack of accepting any personal responsibility for what happened here.

MANLEY:   I apologize for that.

COURT:   It's anger at your ex-husband or current husband, soon-to-be ex-husband, it's anger at the attorneys, it's everybody's fault but yours that you were here, and body language says a lot, and attitude says a lot, and this isn't exact science predicting how somebody's going to do on probation, but when somebody has a negative attitude, when somebody consistently looks for others to blame for their conduct, that generally doesn't bode well for a successful term of probation.   How are you going to be any different if you are given an opportunity on probation.

MANLEY: I believe it will help me get through this divorce finally. This is the second time I've filed and I dismissed it last year and I'm sorry that my demeanor seems negative, I don't mean for that, the only thing I have to say is that, you know, I've been through a couple of years of some really bad stuff, and I'm just a little on alert and defensive and I apologize for that.   It has nothing to do with my attorneys or the Court or the Jury or anything; it just has to do with my state of life for the last couple of years, with the destruction and the physical abuse and everything that has happened, and so I'm trying. * * *

{¶ 21} Sheila asserts three assignments of error herein.   Her first assigned error is as follows:

APPELLANT WAS PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL.

**{¶ 22}** Sheila asserts as follows:

In this case, trial counsel should have allowed Defendant to testify if she so wished to exercise her right. It is well established that Defendants have the "last say" of whether or not they will testify on their own behalf. She had evidence and individual witnesses present who would help prove her testimony. She was not afforded an opportunity to present any evidence on her behalf or given the opportunity to rebut Mr. Manley's testimony. Any testimony rebutting the alleged victim's testimony is pertinent in this case, as only two individuals witnessed the alleged offense, Mr. and Mrs. Manley. Therefore, if Mrs. Manley would have been given the opportunity to testify, there is a reasonable probability that the result would have been different.

**{¶ 23}** As this Court has previously noted:

* * * A claim of ineffective assistance of trial counsel requires both a showing that trial counsel's representation fell below an objective standard of reasonableness, and that the defendant was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A reviewing court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The prejudice prong requires a finding that there is a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different, with a reasonable probability being "a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989).

*State v. Cunningham*, 2d Dist. Clark No. 2013 CA 50, 2014-Ohio-3949, ¶ 7.

**{¶ 24}** As this Court has previously noted, "[t]he right to testify is an inherently personal right and is exercised or waived by the client, not the attorney." *State v. Copeland,* 2d Dist. Montgomery No. 18711, 2002 WL 63161, *2 (Jan. 18, 2002). "Absent evidence to the contrary, the appellate court must presume that a defendant-appellant's failure to testify was the result of his knowing and intelligent decision. *State v. Carter* (1996), 115 Ohio App.3d 770, 776, 686 N.E.2d 329." *Copeland*, *3. As the State asserts, "a trial court is not required to conduct an inquiry with the defendant concerning the decision whether to testify in his defense." *State v. Bey*, 85 Ohio St.3d 487, 499, 709 N.E.2d 484 (1999). Further, "[g]enerally, counsel's decision whether to call a particular witness falls within the rubric of trial strategy, and will not be second guessed by a reviewing court. * * * Even debatable tactics and strategies do not constitute ineffective assistance counsel." *State v. Martin*, 2d Dist. Montgomery No. 20610, 2005-Ohio-1369, ¶ 19.

**{¶ 25}** We note that in closing argument, defense counsel advised the jury that "Mrs. Manley and I have no burden here, zero burden here, and *her choice* not to testify cannot be used against her for any purpose." (Emphasis added). Sheila has presented no evidence to rebut the presumption that she knowingly chose not to testify, and we have no basis to find that defense counsel's performance was deficient, and that the

outcome of the trial would have been otherwise, if Sheila had testified on her own behalf. While Sheila further asserts that she had evidence and witnesses present to rebut the State's evidence, she does not identify the evidence or witnesses, or indicate how any additional evidence or testimony would have altered the outcome of the trial. As the State asserts, Sheila's version of events, namely that she did not touch David at all and that he instead was perhaps injured in a fall due to being intoxicated, was before the jury through the testimony of the officers.   Finally, we note that defense counsel thoroughly cross-examined each of the State's witnesses, drawing attention to inconsistencies in their testimony and suggesting that David's conduct may have been motivated by a desire to obtain exclusive possession of the marital residence.   Since Sheila has failed to demonstrate ineffective assistance of defense counsel, her first assigned error is overruled.

{¶ 26} We will consider Sheila's second and third assignments of error together. They are as follows:

APPELLANT'S CONVICTION OF DOMESTIC VIOLENCE WAS AGAINST THE MANIFEST WEGHT OF THE EVIDENCE,

And,

THE STATE'S EVIDENCE WAS INSUFFICIENT TO SATISFY ITS BURDEN TO PROVE EACH AND EVERY ELEMENT OF THE CRIME BEYOND A RESONABLE DOUBT.

{¶ 27}   Sheila asserts that she "did not cause or attempt to cause physical harm to her husband because the evidence shows that she had no marks on her hands consistent with a closed-hand punch.   Further, no other individuals witnessed the alleged

offense beside Mr. Manley who had motive to contrive a story in an attempt to remove her from the home, pending divorce." Sheila asserts that Engles did not notice any injuries as David approached the officers outside, and that Engles characterized David's wound as " 'None, minor injury' " in his report. Sheila asserts that David did not seek medical treatment. She asserts that while David testified that he blocked a second punch by Sheila with his arms, there were no visible marks on his arms. Sheila notes the inconsistencies in David's testimony regarding the time the offense occurred. According to Sheila, once "the officers explained to Mr. Manley that he needed to swear by a complaint that the incident occurred, he refused to sign and swear by that statement." Sheila notes that their son and daughter advised Savino that they did not hear or see anything on the night of the incident.

{¶ 28} As this Court had previously noted:

"[A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12. *See Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is contrary to the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of

justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. *Id.* The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717.

*State v. Hudson*, 2013-Ohio-2351, 993 N.E.2d 443, ¶ 40-41 (2d Dist.).

**{¶ 29}** As this Court has further noted:

A sufficiency of the evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is

whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 259-60, at paragraph two of the syllabus

*State v. Garvin*, 2d Dist. Montgomery No. 21362, 2006-Ohio-7089, ¶ 7.

{¶ 30} R.C. 2919.25 proscribes domestic violence and provides: "(A) No person shall knowingly cause or attempt to cause physical harm to a family or household member."

{¶ 31} Having thoroughly reviewed the entire record, weighed the evidence and all reasonable inferences, we cannot conclude that the jury lost its way and created a manifest injustice requiring the reversal of Sheila's conviction. We further conclude that the State's evidence, if believed, would convince the average juror beyond a reasonable doubt that Sheila committed domestic violence against her husband, David. David testified that he was awakened by Sheila while sleeping in the basement of their home, and that after arguing with her, she punched him in the face and damaged his glasses. David stated that he raised his arms to protect himself from a subsequent punch. Photographs of David's face reflect a visible injury with broken skin on the left side of his nose consistent with his testimony about where Sheila hit him. David advised both officers that Sheila hit him, and he provided a written statement regarding the incident as well. While Engles did not notice David's injury upon arrival, Engles stated that it was dark outside at the time, and he later indicated to Sheila that David "had a small cut on his nose." He further indicated that David had sustained a "minor injury" in his police report. Savino also testified that David had "a little cut that was slightly bleeding right on

the upper basically left part of his nose area." This injury is documented in State's Exhibits 9 and 10. The jury clearly credited David's testimony regarding his injury, and we defer to the jury's credibility assessment.

**{¶ 32}** While Sheila's hands were free of red marks or any indication that she struck David, Engles testified that it is common to find no marks on a person's hands after striking someone. Although Sheila suggested that David injured himself due to being intoxicated, and David admitted to drinking a few beers, Savino testified that David did not appear to be intoxicated. While the son told the police that he did not see or hear anything on the night of the incident, he acknowledged at trial that he lied to the officers that night, and that he heard Sheila yelling at David from the basement, which was consistent with David's testimony.

**{¶ 33}** For the foregoing reasons, we can conclude that Sheila's conviction for domestic violence is not against the manifest weight of the evidence. Further, viewing the evidence in a light most favorable to Sheila, any rational trier of fact could have found the essential elements of domestic violence proven beyond a reasonable doubt; Sheila's second and third assignments of error are overruled. The judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and HALL, J., concur.

Copies mailed to:

John D. Everett
Maria L. Rabold
Hon. Frederick W. Dressel